IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BRIAN WEIBEL                                                                    PLAINTIFFS

v.                                                     CIVIL ACTION NO. 1:24-CV-155-SA-DAS

PREGIS LLC                                                                       DEFENDANTS

ORDER AND MEMORANDUM OPINION

On August 19, 2024, Brian Weibel initiated this action by filing his Complaint [1] against Pregis LLC. The Amended Complaint [39] is now the operative complaint. Weibel brings claims for age discrimination under the Age Discrimination in Employment Act ("ADEA") and retaliatory discharge under state law. Now before the Court is Pregis' Motion for Summary Judgment [75]. The Motion [75] has been fully briefed and is ripe for review. Having considered the parties' filings, as well as applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

In January 2020, Pregis hired Brian Weibel, a mechanical engineer, as its maintenance manager for its Tupelo, Mississippi facility. At the time he was hired, Weibel was 59 years old, and his duties included overseeing plant equipment, safety procedures, maintenance, and troubleshooting equipment failures. The Tupelo facility's management team consisted of Craig Cook (plant manager), Mike Lansdell (manufacturing manager), and Weibel. Weibel and Lansdell both reported directly to Cook and had no supervisory authority over each other.

On June 30, 2023, around midnight, Weibel received a call from Cook, who advised him that a forklift operator had run into a sprinkler pipe causing water to flood the facility. Weibel immediately drove to the facility, turned off the water, and made the required repairs. The following morning, Cook told Weibel to rent two floor scrubbers to clean up the water. Weibel alleges that during this conversation he warned Cook that "we have to be careful because we can't

take the water, pick it up, and dump it out back . . . when you pick it up with the . . . scrubber." [77], Ex. 1 at p. 143. Weibel also alleges he provided the same warning to Lansdell.

Later that morning, Weibel rented a single, 95-gallon tank floor scrubber that the facility staff used to vacuum the water off of the floor. Later that day, Weibel saw Lansdell dumping the floor scrubber tank onto the concrete ramp area right outside of the facility. Weibel later learned it was the second time that day Lansdell had dumped the scrubber tank—meaning at least 190 gallons of scrubber water had already been dumped.

When Weibel observed Lansdell dumping the scrubber water, he immediately photographed Lansdell to document the incident. He testified that "there wasn't a need to have a discussion [with Lansdell] [] because . . . I [already] told [Cook] and [Lansdell] that we couldn't discharge it out back." [77], Ex. 1 at p. 152. After seeing Weibel take photographs, Lansdell became upset with him and told him that Cook had instructed him to dump the water outside.

After taking the photographs, Weibel called Jody Lindsey, Pregis' third-party environmental consultant, who, according to Weibel, confirmed that dumping the scrubber water outside "was in violation of [Pregis]' permit" and that it needed to be documented on the monthly spill log. *Id.* at p. 154-55.[1] For reference, the monthly spill log is a self-reporting document that the Mississippi Department of Environmental Quality ("MDEQ") uses to determine the impact of "uncontained releases" and is "a requirement for [Pregis'] MPDES storm water permit." *Id.* at p. 159.

Weibel then reported this call to Cook who testified that he stopped the release of the scrubber water as soon as Weibel informed him that Lindsey said that the scrubber water was a "non-allowable discharge." [77], Ex. 6 at p. 39. Weibel followed this conversation by sending an

---

[1] Lindsey testified that he did not recall this alleged conversation. [77], Ex. 11 at p. 58.

email to Lansdell attaching the photographs he had taken and asking how many times he had dumped the scrubber. Weibel copied Cook and Lindsey on that email. After the email, Cook held a meeting with Weibel and Lansdell, during which Lansdell expressed frustration with Weibel taking his picture. Weibel alleges that after this meeting Cook told him not to document the scrubber water release and that he would get Lindsey to investigate the incident.

Following the scrubber incident, in September 2023, Cook issued Weibel a disciplinary write-up, referred to as a "coaching," for, on multiple occasions, being "rude, demeaning, and disrespectful[.]" [77], Ex. 16 at p. 1. The "coaching" identified a specific complaint of his treatment of a Grainger sales representative and stated that "this was not the first-time[.]" *Id.* Also, it noted there were "similar instances around August 2023 with E Fire Protection." *Id.* This was Weibel's first and only disciplinary "coaching" since his employment with Pregis commenced in December 2020.

Beginning in December 2023, cold weather caused some of the outdoor equipment at the Tupelo facility to malfunction. Specifically, the regulators on three isobutane tanks (referred to as the "tank farm") froze reducing the pressure of the gas that was being pumped through them.[2]

Importantly, part of Weibel's job was to ensure compliance with the facility's Process Safety Management Manual (referred to as "the PSM"). The PSM outlines requirements to follow in Class 1, Division 1 areas including the tank farm. The Class 1, Division 1 classification mandates strict requirements for the types of equipment utilized in that area. Relevant here, the use of electrical equipment was restricted due to the flammable nature of the tank farm.

To combat the freezing, Weibel wrapped one of the regulators with "hot hand" warmers. This temporary solution yielded positive results and Weibel applied "hot hands" to the other two

---

[2] For reference, each tank's regulator was roughly a foot long. [77], Ex. 1 at p. 76.

regulators. Weibel testified that, around this time, Cook instructed him to call Willis Vance, who was the maintenance manager at Pregis' Granite Falls, North Carolina facility, to help troubleshoot and find a permanent solution to the frozen regulator problem. Weibel testified that he called Vance who recommended replacing the "hot hands" with heated electrical wire called "heat trace" to warm the regulators. Vance explained he had used "heat trace" in similar circumstances with positive results. During this conversation, Weibel alleges that he asked whether the "heat trace" used at the Granite Falls facility was used in a Class 1, Division 1 area. Weibel testified that he did not recall the specific response but alleges that Vance said, "[that] is what I would do." [77], Ex. 1 at p. 85. Vance denies he told Weibel to install the "heat trace" on the regulators located at the tank farm.

Following this conversation, Weibel testified he asked Cook whether Vance's alleged "heat trace" solution would violate safety protocols. Weibel then testified that Cook told him to put the "heat trace" on and Weibel installed it on one of the regulators. Cook testified to the contrary and stated that he did not remember Weibel mentioning "heat trace" and that he did not learn what "heat trace" was until later. Two days after installation, the regulator performed better and Weibel alleges that Lansdell and Cook both personally viewed the "heat trace" on the regulator. Cook then approved Weibel to install "heat trace" on the remaining two regulators.

Later in January 2024, Vance and another Pregis employee visited the Tupelo facility to install equipment upgrades. During the visit, Weibel showed them the "heat trace" on the regulators. Vance took pictures, which he sent to an outside contractor. After a call with that contractor, Jeff Smith, Pregis' corporate engineering manager, told Weibel to remove the "heat trace." Weibel complied within minutes of the call.

4

A few days later, Scott Rodgers, Pregis' HR director, investigated Weibel and the "heat trace" incident. The investigation found that Weibel was negligent in his role as maintenance manager by violating key elements of the PSM in his decision to use "heat trace" on the regulators. The investigation report noted that Vance denied telling Weibel to install the "heat trace." Rodgers testified the "heat trace" incident was the sole reason for the termination, but the report included "Other Issues" that noted Weibel's disciplinary September "coaching" and two annual performance reviews with low ratings.[3]

Following the investigation, Pregis terminated Weibel, who was 63 years old at the time, on February 9, 2024. Rodgers testified that he, Cook, and Nat Weiner, Vice President of Operations, made the termination decision. On April 1, 2024, Pregis hired Casey Poyner, who Weibel alleges "was either 46 or 47 years old" at the time, as Maintenance Manager at the Tupelo facility. [78], at p. 18. Thereafter, Weibel filed an EEOC Charge and received a right to sue letter on July 18, 2024. This lawsuit followed. Through its present Motion [75], Pregis seeks summary judgment as to Weibel's age discrimination and retaliation claims.

*Legal Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

---

[3] The report stated "Brian [Weibel] is set to receive below "Meets Expectations" review (2.25/5.0) for 2023 performance year. Brian was rated 2.75 in 2023 [2022 performance year]." [77], Ex. 19 at p. 2.

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As previously noted, Weibel brings a state law claim for retaliatory discharge and an age discrimination claim under the ADEA. The Court will first consider the state law claim before turning to the ADEA claim. At the outset, the Court notes that the two claims are analyzed under different frameworks and standards. This distinction, as the Court will explain *infra*, results in different outcomes.

I.      *McArn retaliatory discharge*

Mississippi has long recognized that employers may terminate employees "for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible." *McArn v. Allied Bruce-Terminix Co., Inc.*, 626 So.2d 603, 606 (Miss. 1993)

(quoting *Shaw v. Burchfield*, 481 So.2d 247, 253-254 (Miss. 1985)). In *McArn*, the Mississippi Supreme Court created a narrow exception to this rule for reporting the illegal activity of an employer to the employer or anyone else. *Id.* at 607. In order to succeed on his *McArn* claim, Weibel must show that: (1) he was an employee of Pregis, (2) Pregis committed an illegal act, and (3) he was terminated because he reported the illegal act of Pregis. *See Brandi's Hope Cmty. Sers., LLC v. Walters*, 391 So.3d 162, 170 (Miss. 2024) (citing *McArn*, 626 So.2d at 607).

Weibel alleges that he was terminated for reporting a Clean Water Act ("CWA") violation related to the release of the scrubber water outside of the facility. In response, Pregis argues that Weibel cannot show (1) the existence of an illegal activity or (2) a causal connection between the reporting of the alleged illegal activity and his termination.

### A. Whether an actual CWA violation occurred

To sustain a claim under *McArn*, the reported illegal act which caused the termination must "warrant the imposition of criminal penalties, as opposed to mere civil penalties." *Guest-White v. Checker Leasing, Inc.*, 2016 WL 595407, at *4 (N.D. Miss. Feb. 11, 2016) (quoting *Hammons v. Fleetwood Homes of Mississippi, Inc.*, 907 So.2d 357, 360 (Miss. Ct. App. 2005)). Importantly, it is insufficient to only show that the employee "reasonably believed that the complained-of activity is criminally illegal[,]" the alleged act must be *actually* illegal. *Id.* (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 403 (5th Cir. 2005)).

Under the CWA, authorized state agencies, like the MDEQ, issue permits that impose requirements on entities that wish to discharge "pollutants" in the waters of the United States. *City and Cnty. of San Francisco, California v. Env't Prot. Agency*, 604 U.S. 334, 145 S. Ct. 704, 221 L. Ed. 2d 166 (2025). "A critical component of the CWA regulatory scheme is the National Pollutant Discharge Elimination System (NPDES), which makes it unlawful to discharge

pollutants into covered bodies of water unless authorized by permit." *Id.* (citing *EPA v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 205 96 S. Ct. 2022, 48 L. Ed. 2d 578 (1976)). The CWA prescribes criminal penalties for "[n]egligent violations" and "[k]nowing violations" of these requirements. *United States v. Pruett*, 681 F.3d 232, 238 (5th Cir. 2012) (citing 33 U.S.C. § 1319(c)(1)(A)). Because Weibel's subjective belief on legality is irrelevant, the question before the Court is whether a criminal violation of the CWA *actually* occurred.

For the sake of clarity, an overview of the applicable regulation and enforcement procedures is necessary. The MDEQ regulates discharges of stormwater and non-stormwater at covered industrial facilities, including Pregis, and requires them to apply for a stormwater permit and maintain a stormwater pollution prevention plan. During the relevant time frame, Pregis maintained a valid, MDEQ-issued "Industrial Stormwater General Permit For Industrial Activities[,]" which authorized stormwater discharges associated with industrial activity. [77], Ex. 14 at p. 7. The permit defines "stormwater" as "rainfall runoff, snowmelt runoff, and surface runoff" and allows discharges composed entirely of stormwater and allowable non-stormwater discharges. *Id.* at p. 51; 8. Under the permit, allowable non-stormwater discharges are expressly limited to 13 categories that include, *inter alia*, "[d]ischarges from actual fire-fighting activities" and "[f]ire hydrant flushings." *Id.* at p. 9. Plainly speaking, if a discharge is not stormwater or an allowable exception, an additional NPDES permit is required.

Here, it is undisputed that the released scrubber water was not stormwater. Therefore, Pregis criminally violated the CWA if it negligently or knowingly discharged the scrubber water unless it falls within a specific exemption. Pregis makes two primary arguments to this point: (1) the released scrubber water was not a "discharge" and (2) even if the release had been a

8

"discharge," it was an allowable non-stormwater discharge.[4] Before addressing each argument, the Court notes that Weibel and Lindsey are properly designated as hybrid fact/expert witnesses under Federal Rule of Civil Procedure 26(a)(2)(C).

       i.        *Whether the released scrubber water was a discharge*

In order for the scrubber water release to be considered a "discharge" it must reach the "waters of the United States." *United States v. Brink*, 795 F. Supp. 2d 565, 575-76 (S.D. Tex. June 6, 2011). Here, it is undisputed that if the scrubber water reached an "outfall," which is a "place[] on-site where the water leaves the property in like a ditch or conveyance," then it is properly considered a "discharge." [77], Ex. 11 at p. 44.

To this point, Pregis, relying on its expert Ken Ruckstuhl's report, argues that because the water was released on a sunny day in June that it "plausibl[y] . . . evaporated or infiltrated soil" before reaching any outfall. [76] at p. 12. In response, Weibel himself, who was designated as a hybrid fact/expert witness, stated in his expert designation that "more likely than not, some of the contaminated water flowed into the eastern drainage outfall . . . approximately 200 linear feet from the discharge area." [77], Ex. 1 at p. 265.

Pregis argues that Weibel's expert opinion is insufficient to create a question of fact because "more likely than not" is a civil standard of proof and not the proof of actual criminal conduct that is required under *McArn*. Pregis, without identifying any authority, appears to argue that Weibel is required to prove beyond a reasonable doubt that the scrubber water reached the outfall. The Court finds no basis to support this proposition and declines to extend *McArn* to add

---

[4] Pregis makes some argument that if the scrubber water had reached an outfall that Weibel would have been required to collect a jar sample on the date of the release. Upon review of the permit, the Court notes that the jar sample requirement expressly applies to stormwater discharges, not, as Pregis argues, allowable non-stormwater discharges. [77], Ex. 14 at p. 20. Notwithstanding, the Court finds this argument, even if true, does not alter the outcome.

9

this requirement. *See Guest-White*, 2016 WL 595407 at *4-5 (only requiring the plaintiff to offer evidence of each element of underlying criminal charge). Further, Ruckstuhl's report only states that it is "feasible" that the scrubber water did not reach the nearest outfall. [75], Ex. 5 at p. 4. To reiterate, Pregis, as the moving party, bears the burden at this stage to prove that a violation did not occur.

The Court finds that Ruckstuhl and Weibel's expert testimony creates a triable question of fact for the jury as to whether the scrubber water reached an outfall.[5]

> ii.     *Whether the scrubber water was an allowable non-stormwater discharge*

As noted previously, certain non-stormwater discharges are exempt from the NPDES permit requirement. Pregis argues, again relying on Ruckstuhl's report, that if the scrubber water was a discharge, it "could [] have been interpreted to qualify" as an allowable non-stormwater exception under the "[d]ischarge from actual fire-fighting activities" or "[f]ire hydrant flushings" exception. [75], Ex. 5 at p. 5. In response, Weibel points to the deposition testimony of Lindsey, who again was designated as a hybrid fact/expert witness, who testified:

> Q.      . . . Was that [scrubber] water any of these allowable non-storm water discharges that are listed here on . . . the [Industrial Stormwater] general permit?
>
> A.      Don't appear to be.

[77], Ex. 11 at p. 44

He went on to clarify that:

---

[5] Pregis makes some argument that the conflicting expert testimony surrounding the alleged discharge at most creates a regulatory question, not the required showing of actual criminal illegality under *McArn*. This argument is a non-starter. As noted previously, §1319(c) of the CWA explicitly provides for criminal penalties. *See e.g. United States v. ExxonMobil Pipeline Co.*, No. 08-10404, *plea agreement entered* (D. Mass. Dec. 23, 2008); *United States v. Citgo Petroleum Corp.*, 697 F. Supp. 2d 670, 673 (W.D. La. Mar. 4, 2010).

> Q. If the water from the scrubber made it to the outfall on June 30th of 2023, then that would have technically been a violation of the storm water permit, correct?
>
> A. Yes.

*Id.* at p. 47-48.

In other words, Lindsey's testimony is that the scrubber release was *not* an allowable non-stormwater discharge exempt from the permit requirement. The Court finds the expert testimony of Lindsey sufficient to preclude summary judgment.

Additionally, Pregis points to Lindsey's recommendation to document the scrubber event on the monthly spill log as evidence that an actual crime had not occurred, arguing "[i]f Lindsey had believed a criminal violation of the Clean Water Act had taken place, one would expect something far more than a notation on a monthly spill log." [80] at p. 3-4. The Court does not find this speculation persuasive. To reiterate, the question is not whether Lindsey subjectively thought a criminal violation occurred but whether a criminal violation *actually* occurred. Further, Weibel's testimony that Cook directed him to not document the spill undercuts this argument. [77], Ex. 1 at p. 157.

In conclusion, the Court finds that Weibel has come forward with sufficient evidence to preclude summary judgment as to whether an actual criminal violation of the CWA occurred. The Court now turns to causation.

### B. Whether Pregis terminated Weibel because he reported the alleged CWA violation

Next, Pregis argues that there is no causal connection between the scrubber water incident and Weibel's termination because (1) Rodgers did not have knowledge of the scrubber water incident until after the termination and (2) there was a seven-month gap between the incident and his termination.

11

To be clear, the *McArn* 'because of' causation standard is less stringent than the ADEA's 'but-for' causation standard. *Jordan v. Wayne Farms, LLC*, 2017 WL 3653801, at *2 (S.D. Miss. July 31, 2017); *see also Sanford v. Jacobs Tech., Inc.*, 2015 WL 3604292, at *3 n.3 (S.D. Miss. June 8, 2015) (finding no support under Mississippi law that a *McArn* wrongful discharge claim is subject to a 'but-for' causation standard). Under *McArn*, a plaintiff must show that "retaliation was among the reasons for his termination even if the defendant had other, justified reasons for the termination." *Id.* Under a cat's paw theory, a plaintiff may demonstrate causation by showing that an employee, with retaliatory motives, had influence or leverage over the official decisionmaker. *Sanford v. Jacobs Tech., Inc.*, 2016 WL 320967, at *4 (S.D. Miss. Jan. 26, 2016) (applying cat's paw theory to a *McArn* claim).

The Fifth Circuit considered a somewhat analogous *McArn* claim in *Simmons v. Pacific Bells, L.L.C.*, 787 Fed. Appx. 837 (5th Cir. 2019). In *Simmons*, the plaintiff was hired as a manager at a restaurant owned by Pacific Bells. *Id.* at 838. During his tenure, he received a jury summons and informed his general manager, Carolyn Henderson, who told to him to "find a way out of jury duty." *Id.* at 839. The plaintiff refused and requested time off for jury duty which Henderson denied. *Id.* The plaintiff then explained the situation to the local district manager, Annette Banger, who granted him the time off. *Id.* When he returned to work, Banger, at the recommendation of Henderson, terminated him for tardiness—this was the first time he was reprimanded for being late. *Id.* The plaintiff then brought a wrongful discharge claim under *McArn* for refusing to participate in an illegal act—lying to avoid jury duty. *Id.*

In that case, the defendant argued, in part, that Banger was unaware of the plaintiff's refusal to lie to avoid jury service. *Id.* at 842. To this point, the Fifth Circuit explained that the plaintiff did not need to establish that Banger fired him because of his refusal to lie to avoid jury duty;

instead, applying a cat's paw theory, he only needed to demonstrate that Henderson's recommendation caused his termination and that her recommendation was motivated by his refusal to lie. *Id.* at 843.

In addition, the Fifth Circuit credited the plaintiff for producing circumstantial evidence that indicated his termination based on tardiness was pretextual.[6] Specifically, the plaintiff highlighted he was tardy less often than other coworkers who were not terminated, his tardiness resulted from his employer's business practices, and Henderson recommended his termination and was present for it.

Lastly, the Fifth Circuit emphasized that the defendant bears the burden of proof as the moving party. *Id.* at 842-43.[7] Then the court noted that Henderson, as the person who allegedly instructed the plaintiff to commit the illegal act, is an interested witness that a jury is not required to believe. *Id.* at 843. Ultimately, the Fifth Circuit, considering Henderson's termination recommendation and other circumstantial evidence, reversed the district court's grant of summary judgment.

The Court finds *Simmons*, in many pertinent ways, analogous. Pregis, like the defendant in *Simmons*, relies on the fact that Rodgers, who again conducted the "heat trace" investigation, did not know about the scrubber incident until Weibel filed his EEOC charge—after his termination. Notwithstanding, Cook was one of three individuals responsible for the termination decision, and importantly, possessed firsthand knowledge of the "heat trace" incident *and* the scrubber water

---

[6] The Court is compelled to emphasize that the *McDonnell Douglas* burden-shifting framework does not apply to a *McArn* claim; however, courts have found "Title VII law informative in this context." *Sanford*, 2016 WL 320967 at *4.

[7] This differs from *McDonnell Douglas* which shifts the burden to the plaintiff at the pretext stage.

13

incident.[8] Differing from *Simmons*, it is unclear whether Cook directly recommended Weibel's termination. In his deposition, Cook testified:

> Q.     [] Were you part of the team that decided . . . [Weibel] needs to go, or were you more of an . . . information-giving and -receiving role?
>
> A.     . . . I definitely gave information. I don't remember if I was – if I had a vote. I really – don't. When it came down to that – for the final determination, they probably asked me my opinion . . .

[77], Ex. 6 at p. 70.

But Cook also testified:

> Q.     . . . Did you support the decision to terminate [Weibel]?
>
> A.     I did.

*Id.* at p. 71-73.

Counter to Cook's uncertain testimony, Rodgers testified:

> Q.     . . . [W]ho was the ultimate decision-maker – the person who ultimately made the decision to terminate [Weibel]'s employment?
>
> A.     Yeah, I would say it's a three-person collaboration between myself, who led the investigation; Craig [Cook], who was the plant manager – manager and plant leader; and then out vice president of operations, Nat Weiner.

[77], Ex. 18 at p. 13-14.

Lastly, Cook personally led the conversation, along with Rodgers, informing Weibel of his termination. [77], Ex. 6 at p. 72. Not only is a jury not required to believe the statements of Cook as an interested witness, but the record also clearly shows that Cook played *some* role in the termination decision. The Court finds, similar to *Simmons*, that a reasonable jury could conclude that Cook influenced the termination decision and that influence was motivated by Weibel's

---

[8] At all relevant times, Nat Weiner, the other individual involved in the termination decision, was a remote employee. [77], Ex. 18 at p. 14. Rodgers also testified that he had no personal interactions with Weibel before the "heat trace" incident investigation. *Id.*

reporting of the CWA violation. As such, a question of fact exists as to whether Cook influenced the ultimate decision to terminate Weibel's employment and whether Cook's conduct was retaliatory.

In addition, Weibel points to circumstantial evidence indicating his termination based on the "heat trace" incident was a pretextual rationale for his termination. To start, the "heat trace" incident resulted, in part, from Pregis' business practices. First, Weibel testified that he frequently collaborated with Vance on equipment issues at the Tupelo plant. Second, Cook instructed Weibel to call Vance about the frozen regulator issue for suggestions. Third, Weibel testified that Vance recommended the "heat trace" and Cook approved the installation. Given this testimony, the record shows, like in *Simmons*, that the "heat trace" incident resulted, in part, with Pregis' consent and pursuant to its practice of troubleshooting equipment issues with Vance.

Next, the Court finds it crucial that Cook and Lansdell were both also involved in the "heat trace" incident, yet they suffered no consequences. As previously noted, Weibel alleges that Cook approved the use of "heat trace," Cook and Lansdell both personally viewed it on the first regulator, and Cook approved its use on the rest of the tank farm. Despite this active participation in the "heat trace" incident, neither Cook nor Lansdell were terminated or received any adverse employment action. In fact, as previously mentioned, Cook played a critical role in Weibel's termination decision.

Further, notwithstanding his approval of its use, the investigation report states that Cook told Rodgers that Weibel "should have known this [heat trace] was not an acceptable solution[.]" [77], Ex. 19 at p. 2. The Court, like in *Simmons*, finds that Weibel has provided competent summary judgment evidence of specific facts sufficient to create a question of fact as to whether the "heat trace" incident was pretextual.

15

Briefly, Pregis makes some argument that the seven-month temporal gap between the report of the CWA violation and his termination *de facto* defeats any inference of causation. In support, Pregis cites two Title VII cases that considered temporal proximity when it was the *only* evidence of causation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 275, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (holding that "cases that accept mere temporal proximity . . . must be 'very close'") (additional citations omitted); *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471, 472 (5th Cir. 2002) (finding plaintiff presented no evidence other than five month temporal proximity). In addition to not being bound by Title VII case law in evaluating a *McArn* claim, the Court also finds both of these cases distinguishable as Weibel does not rely solely on temporal proximity. While a jury may ultimately find that the temporal gap defeats causation, Weibel produced sufficient evidence to leave that question in the province of the jury.[9]

In short, this is a factual dispute that "requires weighing the credibility of witness testimony and evidence." *James v. CLC of Pascagoula, LLC*, 2017 WL 3749815, at *4 (N.D. Miss. Aug. 30, 2017). The Court finds that a reasonable jury could conclude that retaliation for reporting the CWA violation played a role in Weibel's termination. As a result, summary judgment is inappropriate at this stage.

*II.    ADEA Claim*

In his Amended Complaint [38], Weibel alleges that he "was terminated from Pregis because of his age" in violation of the ADEA. [39] at p. 4.[10] To establish an ADEA claim, "[a]

---

[9] In addition, Weibel appears to make some argument that his September 2023 coaching, which occurred only three months after the scrubber incident, resulted from his reporting of the CWA violation. While the Court finds it to have some persuasive value, it need not rely on the September 2023 coaching because Weibel does not rely on temporal proximity alone.

[10] Weibel alternatively alleged that his age was a motivating factor in his termination. [1] at p. 4. This argument is a non-starter. The Supreme Court has made clear that showing age was a 'motivating factor' is insufficient to prove a claim under the ADEA. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 n.3, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009).

plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citing *Gross*, 557 U.S. at 178, 129 S. Ct. 2343). Where a plaintiff relies on circumstantial evidence to prove his age discrimination claim, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *Moss*, 610 F.3d at 922 (5th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under that framework, a plaintiff must first establish a *prima facie* case, then, if the plaintiff does, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Moss*, 610 F.3d at 922 (quoting *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)).

If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the provided reason is "merely pretextual." *Id.* (citing *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378-79 (5th Cir. 2010)). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (internal quotation marks omitted).

*A. Prima Facie Case*

In order to establish a *prima facie* case, a plaintiff must show that: "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Dabbasi v. Motiva Enters., L.L.C.*, 107 F.4th 500, 505 (5th Cir. 2024) (citing *Jackson*, 602 F.3d at 378) (citation omitted).

Pregis does not appear to contest that Weibel established a *prima facie* case. To this point, Weibel asserts that he was replaced by Casey Poyner who was roughly 15 years younger than him at the time. For the purposes of summary judgment, Weibel has met his *prima facie* burden.

### B. Legitimate, Non-discriminatory Reason

The burden now shifts to Pregis to provide a legitimate, non-discriminatory reason for the termination decision. *See Moss*, 610 F.3d at 922. At this stage, Pregis' burden is simply to produce "evidence, which taken as true, would permit the conclusion that there was a non-discriminatory reason for the adverse action." *Ruth v. Eka Chemicals, Inc.*, 92 F. Supp. 3d 526, 531 (N.D. Miss. Feb. 17, 2015) (quoting *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)) (additional citation and emphasis omitted). Pregis' proffered non-discriminatory reason for terminating Weibel is that he violated the PSM by installing the "heat trace" in a Class 1, Division 1 area creating a serious explosion risk.

Importantly, Pregis is "not required to persuade the court that it was actually motivated by the proffered reasons … It must only clearly set forth, through the introduction of admissible evidence, the reasons for its decision." *Ruth*, 92 F. Supp. 3d at 532 (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 901 (5th Cir. 2012)) (additional citation and internal quotation marks omitted). This step involves no credibility assessment. *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236 (5th Cir. 2016). For summary judgment purposes, Pregis has satisfied its burden.

### C. Pretext

The burden now shifts back to Weibel to establish pretext. *See Moss*, 610 F.3d at 922. "At the third step, the employee must produce evidence, or rely on evidence already produced, that refutes or contests the employer's evidence of a legitimate, nondiscriminatory reason. Stated differently, the employee must produce or rely upon evidence that the employer's legitimate, non-

discriminatory reason was only a pretext—that is, a false or weak reason ... advanced to hide the actual ... reason." *Billups v. Louisville Municipal Sch. Dist.*, 2026 WL 905122, at \*7 (N.D. Miss. Mar. 21, 2026) (citing *Heinshon v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236-37 (5th Cir. 2016)) (additional citation omitted). At this stage, the question "is not whether [Weibel] proves pretext, but rather whether [he] raises a genuine issue of fact regarding pretext. *Id.* (quoting *Amburgey v. Cohart Refractories Corp.*, 936 F.2d 805, 813 (5th Cir. 1991)).

Importantly, "the plaintiff always retains the ultimate burden of persuasion that there is a nexus between his termination and his age." *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 740 (S.D. Tex. Jan. 13, 2014) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 513-519, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). While age does not have to be the only reason for an adverse employment decision, it must be a factor in the employer's decision and have a determinative influence on the outcome. *Id.* (citing *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248 (5th Cir. 1996)).

In his Response Memorandum [78], Weibel "incorporates the evidence and argument" from his pretext analysis in his *McArn* claim and asserts that his "*prima facie* case plus this pretext evidence allows a jury to infer that Pregis is dissembling to cover up its discriminatory purpose." [78] at p. 28. He makes no other argument as to pretext for his age discrimination claim. As noted previously, *McArn* and the ADEA apply different frameworks and causation standards. Under *McDonnell Douglas*, as opposed to *McArn*, the burden of persuasion shifts to the plaintiff.

Recently, the Fifth Circuit emphasized that the "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Owens v. Cicassia Pharms., Inc.*, 33 F.4th 814 (5th Cir. 2022) (citing *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). This is one of those instances.

While Weibel has presented evidence to connect his reporting of the alleged CWA violation with a retaliatory termination, he has failed to point to a single piece of evidence that connects his termination with his age. *See Hicks*, 509 U.S. at 517, 113 S. Ct. 2742 ("*McDonnell Douglas* does not say . . . that all the plaintiff need do is disprove the employer's asserted reason."). Further, the record is devoid of any fact that would allow a reasonable factfinder to infer discrimination. *See Owens*, 33 F.4th at 814 ("Even when an employee presents evidence that would allow a jury to conclude that an employer's proffered justification for an adverse action is false, that does not necessarily permit a rational inference that the real reason was discrimination."). In other words, Weibel failed to carry his burden.

In line with *Owens* and *Reeves*, the Court finds that Weibel has failed to come forward with sufficient evidence to raise a genuine question of fact as to whether his age was a 'but-for' cause for his termination. As such, summary judgment as to Weibel's ADEA claim is proper.

*Conclusion*

For the reasons set forth above, Weibel's Motion for Summary Judgment [75] is GRANTED IN PART and DENIED IN PART. Weibel will be permitted to proceed to trial on retaliatory discharge claim. His ADEA claim is hereby DISMISSED *with prejudice*.

SO ORDERED, this the 8th day of May, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE

20